Matthew MOODY, Petitioner

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 05SC479.

Supreme Court of Colorado,
En Banc.

May 29, 2007.

Rehearing Denied June 25, 2007.*

* Justice Eid does not participate.

Douglas K. Wilson, Colorado State Public Defender, Elizabeth Griffin, Deputy State Public Defender, Denver, Colorado, Attorneys for Petitioner.

John W. Suthers, Attorney General, Elizabeth Rohrbough, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent.

Chief Justice MULLARKEY delivered the opinion of the court.

## I. Introduction

We granted certiorari to review the court of appeals' unpublished opinion in *People v. Moody*, No. 04CA0361, 2005 WL 1181054 (Colo.App. May 19, 2005). In that decision, the court of appeals undertook sua sponte review of Petitioner Matthew Moody's standing to challenge the legality of the search that yielded evidence used to secure his conviction—an issue that the prosecution had not raised before either the trial court or the appeals court. Relying on Moody's trial testimony, the appeals court determined that Moody had no privacy interest in the property searched and, in any event, he had disavowed any interest he might have had through his testimony. We now reverse the court of appeals' decision as it pertains to Moody's standing. While the appeals court was not precluded from conducting a sua sponte inquiry into Moody's standing, we conclude the panel should have limited its review to the record at the suppression hearing, which was lacking facts necessary to make a fully informed determination.

## II. Facts and Procedural History

On the morning of May 13, 2003, Northglenn police were summoned to a Ramada Inn Hotel to investigate a purported bomb threat. When they arrived, the hotel manager recommended the police speak with several hotel occupants—Matthew Moody and his three companions—who had been reluctant to present identification when checking in the night prior. The officers knocked on the door of the room occupied by Moody, who answered the door. The officers asked whether they could come in to talk to Moody, and he allowed them to enter.

Once inside, the officers discovered the room was in disarray, strewn with bottles, food containers, and personal effects. Two women were sleeping, and both Moody and Michael Yamaguchi, the other two occupants, appeared to have recently awakened. The officers asked Moody whether there were any illegal items in the room, and Moody produced a marijuana pipe. Another officer noticed a zippered black attaché case on the floor, which he pushed with his foot while inquiring about its contents.[1] The kick partially opened the bag, exposing what appeared to be the handle of a handgun. Removing the object, which was in actuality a pellet gun, the officer asked Moody and his companions who owned the bag. Moody stated he thought the bag belonged to his brother. The officer then thoroughly searched the attaché case and discovered a CD case, gloves, a crowbar, a can of WD–40, and two pieces of fabric fashioned to serve as masks.

Having discovered these items, the officers asked for permission to search the entire room. All the occupants, including Moody, assented to the search, which yielded a .25 caliber handgun and bullets concealed inside the CD case that had already been removed from the bag. After running the serial number of the handgun through a police database, the officers learned the gun had been reported as stolen.

Moody and his companions were arrested. During a tape-recorded interview conducted thereafter, a detective interrogated him

---

1. At the suppression hearing, the officer testified that he could not remember whether he kicked the bag accidentally or whether he deliberately pushed it with his foot.

about information obtained from one of the other occupants, who claimed that Moody was plotting to kill a man named Ron Reece. Moody confessed that he had agreed to help his brother harm Reece, and he admitted that his brother planned to use the handgun either to shoot or to beat Reece. He also disclosed that on several occasions he and his brother had driven past Reece's house to plan the attack. Moody was subsequently charged with conspiracy to commit first-degree murder and crime of violence.

At trial, Moody moved to suppress evidence uncovered during the search because, he argued, the police were without a warrant, they did not obtain valid consent, and all statements and evidence obtained were fruit of the illegal search of the attaché case. Following the testimony of four officers—albeit absent Moody's testimony, as he chose not to take the stand—the trial court denied Moody's motion to suppress, concluding that the contact between the officers and the occupants of the room was a voluntary encounter, rather than a seizure, to which Moody had consented when he allowed the officers to search the room. The trial court also rejected Moody's claim that the officers were required to seek consent to search each individual item in the room. After a two-day jury trial, at which Moody testified, he was convicted of conspiracy to commit menacing by use of a deadly weapon.

On appeal, Moody challenged the trial court's order in the suppression hearing, renewing his complaint that the evidence used against him was the product of an unlawful search. In an unpublished, unanimous opinion, the court of appeals rejected Moody's reassertion of this claim. Notably, however, it did so on the grounds of standing, an issue which the prosecution had not raised before either the trial court or the court of appeals. The appellate panel relied on Moody's trial testimony as having established that Moody had no proprietary or possessory interest in the bag or its contents and, as such, it found that he did not have standing to object to the

search. We now reverse the court of appeals and remand the case back to that court.

## III. Court of Appeals' Reliance on Moody's Trial Testimony

■ As an initial matter, we address the court of appeals' reliance on Moody's trial testimony to determine that he was "without any privacy interest in the bag or its contents" and thus had "abandoned any privacy interest he might have had" when his trial testimony failed to contradict the officers' suppression hearing testimony that Moody had disavowed any interest in the bag or its contents. *People v. Moody,* at *1.

At the suppression hearing, Moody did not testify, but four officers did so, each giving conflicting answers as to whether Moody had claimed ownership of the attaché case and the handgun at the time of the search. At trial, Moody did take the stand; he explained that the bag and most of its contents never belonged to him, and that at one time he owned the masks and the CD case in the bag but had relinquished interest in them prior to the search.[2] Relying on Moody's trial testimony, the court of appeals held that even if Moody had a privacy interest in the bag or its contents at one time, he effectively abandoned that interest with his voluntary denial of ownership. *People v. Moody,* slip. op. at 9, *citing Bond v. United States,* 77 F.3d 1009, 1013 (7th Cir.1996) (ruling a person may forfeit a privacy interest in the contents of personal luggage by abandoning the luggage).

Thus, the court of appeals held that Moody's trial testimony barred his challenge to the search on appeal, pointing to *People v. Thorpe,* 40 Colo.App. 159, 570 P.2d 1311 (1977). In *Thorpe,* the trial court grounded its denial of a motion to suppress evidence on its finding of probable cause. On appeal, the court of appeals found the defendant lacked standing based on his testimony at the suppression hearing in which he disavowed any interest in the searched premises. *Id.* at 164, 570 P.2d at 1316.

---

**2.** The court of appeals relied on several lines from Moody's direct testimony that appear, based on our review of the record, not to have

been intended to address the issue of standing to challenge the search.

■ We disagree with the court of appeals' reading of *Thorpe,* and we conclude its reliance on that case was misplaced. Here, the appellate court referenced evidence and testimony presented in Moody's trial, but *Thorpe* stands only for the narrower proposition that a defendant is bound by his testimony at a suppression hearing in later determinations regarding standing. Just as in *Thorpe,* a trial court ought to focus its inquiry only on the suppression hearing record, and not on the evidence and testimony subsequently presented at trial.

We formally adopt this rule because basic principles of fairness dictate we must. To hold, as the court of appeals did, that a defendant's trial testimony may be used by an appeals court to uphold a trial court's suppression ruling would be to sanction a chilling effect on a defendant's decision to testify at trial. The knowledge that an appellate court will review not only the suppression hearing but also the entirety of the trial may well dissuade a defendant from taking the stand at trial for fear that any statement might be construed to eradicate what may be, in actuality, a very legitimate challenge to a trial court's denial of suppression. *See State v. Smith,* 257 La. 1109, 1128, 245 So.2d 327, 334 (1971) (Barham, J., dissenting) (decrying the majority opinion as forcing the defendant "to be prepared to retry before the jury the question which he has previously presented according to law for a final determination to the judge").

Further, without notice to the defense that the questions entertained at the suppression hearing are not final but instead subject to factual supplementation at trial, the defendant might neglect to challenge certain trial testimony that bolsters the adverse pretrial suppression ruling but is not particularly damaging on the issue of guilt or innocence. LaFave, *Search and Seizure,* (4th ed.2004) § 11.7(d), p. 457–58. By the same token, were an appellate court to rely on the trial record in its review, the prosecution would, in effect, be accorded a second opportunity to pad the appellate record at trial by injecting evidence that could be used on appeal to affirm what would otherwise be an erroneous suppression ruling. *Trusty v. State,* 308 Md.

658, 670–71, 521 A.2d 749, 755 (1987) (declining to consider trial record when reviewing suppression ruling where prosecution attempted to flesh out proof of probable cause "too late" to cure the deficiency at the pretrial hearing).

■ Because we cannot endorse a procedure that encumbers a defendant's ability to take the stand in his own defense while he contests the legality of a search or seizure, we conclude an appeals court may only look to the suppression hearing in reviewing a lower court's ruling on such matters. As such, the court of appeals erred in reviewing both the suppression record and the trial proceedings in its review of standing.

## IV. Court of Appeals' Sua Sponte Review of Standing

■ We next turn to the propriety of the court of appeals' decision to address the question of standing sua sponte when the prosecution failed to raise the issue in the suppression hearing, at trial, or on appeal. Our starting point is the basic principle of appellate jurisprudence that arguments not advanced on appeal are generally deemed waived. *People v. Salazar,* 964 P.2d 502, 507 (Colo.1998) ("It is axiomatic that issues not raised in or decided by a lower court will not be addressed for the first time on appeal."). Indeed, even where a waived point arguably may have led to affirmance of a conviction, courts generally decline to consider such points when parties—the government or otherwise—fail to address them in briefings or arguments. *See, e.g., People v. Hearty,* 644 P.2d 302, 311–12 (Colo.1982) (holding prosecutor's withdrawal of standing objection at suppression hearing waived issue on appeal); *United States v. Ford,* 525 F.2d 1308, 1310 (10th Cir.1975) (seeing no compelling reason to deviate from general rule that government could not raise standing issue for the first time on appeal). Such self-restraint is derived from the contours of our adversarial system, in which "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Rose v. United States,* 629 A.2d 526, 536–37 (D.C.1993) (quoting

*Ford v. United States,* 533 A.2d 617, 624 (D.C.1987)).

Thus, in *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the United States Supreme Court declined to analyze a standing issue it deemed the government to have waived. Before both the district and appeals courts, Steagald unsuccessfully argued that the government was required to secure a search warrant, rather than an arrest warrant, to arrest a third party on his premises. *Id.* at 207, 101 S.Ct. 1642. Meanwhile, the government argued in front of these courts that Steagald had sufficient connections to the searched premises for constructive possession of the contraband seized there, and it represented in its opposition to certiorari review that the searched home was Steagald's residence. *Id.* at 208–09, 101 S.Ct. 1642. However, once certiorari was granted, the government changed its tack and urged instead that Steagald lacked standing because the house searched was not his residence. *Id.* The Court refused to review the merits of the government's standing argument on the grounds that the prosecution had waived its right to raise the issue through its "assertions, concessions, and acquiescence" to certain factual representations. *Id.* at 210, 101 S.Ct. 1642. And it held, more broadly, that the prosecution "may lose its right to raise factual issues of this sort when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation." *Id.* at 209, 101 S.Ct. 1642.

This court has positively cited *Steagald* when addressing situations in which the prosecution failed to raise standing before the trial court. *See People v. McKinstrey,* 852 P.2d 467, 470 n. 4 (Colo.1993) (declining to address whether defendant had legitimate expectation of privacy when prosecution did not raise issue on interlocutory appeal); *People v. Burola,* 848 P.2d 958, 960 n. 2 (Colo. 1993) (rejecting invitation to address standing when prosecution lost the right to raise the issue by failing to address it in front of trial court or seeking certiorari on the question); *People v. Hearty,* 644 P.2d at 311–12.

*See also United States v. Dewitt,* 946 F.2d 1497, 1499–1500 (10th Cir.1991) (ruling prosecution waived its opportunity to raise standing on appeal when it did not raise issue below at suppression hearing and offered no excuse for the omission). *But see United States v. Hansen,* 652 F.2d 1374, 1382 (10th Cir.1981) (concluding "confusing" circumstances made it unfair to impose waiver of standing after prosecution failed to address issue at trial and distinguishing *Steagald* because prosecution had not made contrary assertions about factual predicates of standing).

█ This is not to say that Colorado appellate courts are absolutely precluded from taking up the issue of standing sua sponte. After all, appellate courts have the discretion to affirm decisions, particularly denial of suppression motions, on any basis for which there is a record sufficient to permit conclusions of law, even though they may be on grounds other than those relied upon by the trial court. *People v. Aarness,* 150 P.3d 1271, 1277 (Colo.2006); *see People v. Backus,* 952 P.2d 846, 850 (Colo.App.1998) (holding that appellate courts may choose to accept or reject concessions of counsel and are not bound by them).

█ However, when opting to exercise the power of sua sponte review, appellate courts must chart their course following the guideposts set forth by the United States Supreme Court:

> In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936); *see also United States v. Pryce,* 938 F.2d 1343, 1348 (D.C.Cir.1991) (conducting sua sponte analysis only because the record was not complex and resolution of the issue was easy, "beyond serious debate"); *Lewis v. United States,* 92 F.2d 952, 953–54 (10th Cir.1937) (holding that in criminal cases involving life or liberty of accused, United States appellate courts may

correct errors that were not challenged or reserved by parties).

Critical to these considerations of fairness in sua sponte review is the existence of a complete and factually developed lower court record. This is because it is fundamentally unfair to entrap an unwary defendant by raising a lack of privacy interest for the first time on appeal unless it is absolutely clear that he had no reasonable expectation of privacy. *United States v. Pervaz*, 118 F.3d 1, 4 (1st Cir.1997); *see People v. Spies*, 200 Colo. 434, 440, 615 P.2d 710, 714 (1980) (remanding interlocutory case for further development of record when trial court did not make factual findings necessary to determine whether defendant had standing and evidence in the record was conflicting).

On this issue, *Combs v. United States*, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972), is instructive. Before the district court, Combs moved to suppress evidence on the ground that the search warrant was not issued on probable cause, but his motion was denied, and he was ultimately convicted. *Id.* at 226, 92 S.Ct. 2284. On appeal to the Sixth Circuit, Combs again questioned the validity of the warrant, but the prosecution argued lack of standing, and the appeals court affirmed on that ground. *Id.* at 227, 92 S.Ct. 2284. However, when the case came before the United States Supreme Court, it jettisoned the Sixth Circuit's standing ruling because the record before the Court was virtually barren of facts necessary to determine whether Combs, in fact, had standing. *Id.* Instead, the Court remanded the case back to the district court for proceedings to determine whether Combs enjoyed a protected interest in the premises searched. It reasoned that to decide the standing issue would

be inappropriate when the prosecution failed to challenge standing, lulling Combs into a position where he had no cause to assert a possessory or proprietary claim, which, in turn, resulted in a dearth of factual findings on the issue.[3] *Id.*

*Combs* is illustrative as to why restraint is often the better course, and it sheds light on the hazards encountered by the court of appeals in navigating sua sponte review: it placed itself in the tenuous position of resolving fundamental facts that had not been identified during the suppression hearing. Throughout Moody's appeal, questions lingered as to who had rented the hotel room, who owned the attaché case and the guns, and the relationship, if any, between the seized objects and the occupants of the hotel room. In the suppression hearing, the four officers offered conflicting testimony on these issues, and the trial court judge never made findings of fact about them. Clearly, had the court of appeals adhered to the injunction we issue today against the use of trial testimony in reviewing a lower's courts suppression ruling, *supra*, the factual record available for review would have been too sparse to support any kind of determination as to Moody's standing.

▪ Thus, we hold that while the court of appeals certainly has the power to address a standing issue sua sponte, it may not do so in fairness to the defendant if resolution of the issue cannot be based on a factually complete and straightforward record. *Combs*, 408 U.S. at 227–28, 92 S.Ct. 2284. *Cf. Thorpe*, 40 Colo.App. at 164, 570 P.2d at 1316 (exercising sua sponte review of standing based on defendant's suppression hearing testimony, which created a record factually sufficient to

---

3. Questioning whether *Steagald* and *Combs* can be reconciled, some courts and commentators have postulated that *Steagald* governs those cases in which the government previously made affirmative assertions of facts such as would confer standing, while *Combs* is controlling where the government simply remained silent or neglected to raise standing in lower courts. *See, e.g.,* La-Fave, *Search and Seizure,* § 11.7(e), p. 466–68; *Hansen*, 652 F.2d at 1382 (distinguishing *Steagald* because prosecution had not made contrary assertions about facts regarding standing); *Rose v. United States*, 629 A.2d 526, 536 (D.C.1993) (suggesting waiver might be more appropriate

when the government appears to have deliberately conceded an issue as a matter of strategy, rather than merely failing to argue the point inadvertently). This distinction is reasonable and presents a fair litmus test, but we note that the Court in *Steagald* cautioned only that the prosecution "may" lose its right to invoke issues of standing at the appellate level, signaling that such a determination should be left to the discretion of the courts. *People v. Triantos*, 55 P.3d 131, 134 (Colo.2002) (noting that "may" is indicative of a grant of discretion or a choice among alternatives).

reject defendant's standing argument). Specifically, having elected to review the issue of standing sua sponte in this case, the court of appeals was responsible, at a minimum, for ensuring that there was a sufficient factual record upon which to base its decision.

As a final note, we acknowledge that in some circumstances, where an appellate court has chosen to engage in sua sponte review, remand back to the district court for further factual findings might be appropriate. However, we strongly caution against sua sponte review and remand when, given the passage of time, there is no reasonable possibility that the trial court could develop a better record upon which to proceed. Only in limited situations, such as with interlocutory appeals, has this court seen fit to remand for further findings. *See, e.g., Spies,* 200 Colo. at 440, 615 P.2d at 714 (finding remand appropriate in interlocutory appeal). In this case, which was tried in October 2003, we doubt the witnesses could now shed any type of searching or precise light on the exchanges between the officers and Moody in the hotel room on the day of his arrest. Because the court of appeals failed to ensure that its sua sponte review would be based upon an adequate factual record, we must reverse its decision regarding Moody's standing.

## V. Conclusion

We conclude today that an appeals court may only properly consider evidence presented at the suppression hearing when reviewing a trial court's suppression ruling. We also hold that appellate courts may address issues of standing sua sponte, regardless of whether the prosecution may be deemed to have waived its right to address the question. However, we disapprove of doing so where, as here, the factual record was undeveloped and could not be supplemented with reliable testimony upon remand, given the passage of time. In this case, the record was barren of the facts needed to determine whether Moody had standing to challenge the police searches, particularly when only the evidence presented at the suppression hearing is considered. Accordingly, the appeals court erred by addressing standing sua sponte.

We therefore reverse the opinion of the court of appeals and remand the case to that court for further proceedings consistent with this opinion.

Justice EID does not participate.